UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
LUIS FONSECA, individually and as guardian of
P., his teenage daughter, an Infant,

    Plaintiffs,

    vs.

CITY OF NEW YORK, NEW YORK CITY
DEPT. OF EDUCATION, JANICE BRUCE
and MIGUELINA UREÑA

    Defendants.
------------------------------------------------------------ X

20-cv-1014

**JURY TRIAL DEMANDED**

1. This action is brought under Title IX of the Education Amendments of 1972, and the New York State and City Human Rights Law.

2. Plaintiffs (P. is a fictitious name to protect the identity of a pre-teen minor female) are citizens of the State of Georgia, though they once lived in New York.[1]

3. Defendants are the City of New York, which oversees the Department of Education ("DOE"). The latter defendants have their headquarters, and thus citizenship, in the City and County of New York. Bruce is the principal of DOE Public Intermediate (aka Junior High) School 291 in Brooklyn (from now on "School 291"). Ureña is a counselor at School 291. The citizenships of Bruce and Ureña are unknown. Plaintiffs are confident that neither is a citizen of Georgia.

4. Jurisdiction is predicated on federal question jurisdiction, Title IX, 20 U.S.C. § 1681. Also, since there is diversity between the parties, diversity jurisdiction is tenable in the alternative.

---

[1] Mr. Fonseca is P.'s father. Mr. Fonseca's wife (P's mother) and P.'s two siblings are not parties to this lawsuit, though they are mentioned once below.

FACTS

5. Plaintiffs reallege all previous paragraphs.

6. Plaintiff "P.," a young woman of 13, has special needs and, upon information and belief, suffers from ADD, mild retardation, and perhaps autism – although the last of these is unclear. She presents as non-disabled in person, looking about her age, or maybe a bit more mature. She speaks in a seemingly ordinary way, but if you sit and talk with her for a time, she utters non-sequiturs and focuses on otherwise irrelevant information to the purposes of the conversation.

7. However, when she is silent, one could say that P. appears like a "normal" young woman. In other words, her intellectual disabilities are real. Still, there is nothing about her visibly that would make one think she has a disability.

8. She has an Individualized Education Program (IEP) assigned to her by the DOE. (This lawsuit does not contend that her IEP is inadequate.)

9. P. appears older than thirteen; this statement is subjective, but one could reasonably say that for her age group, she seems well-developed and attractive.

10. School 291 has mainstream and special-needs students; the two categories of students interact, among other things, between classes, on the playground, at lunch, and at school-wide events. P. attended only special-needs courses, however.

11. P.'s father, Plaintiff Luis Fonseca, is also a Parent Advocate at School 291. He started in that role when P. entered 291. He was also on the 291 PTA. He loved acting in both roles, one of which provided a modest stipend. (He will remain in the latter position until his appointment expires, despite his move to Georgia.)

12. The DOE actively – at least now – encourages Parent-School interaction and relationships. The issue appears multiple times on the DOE website, of one page is titled "Parent Empowerment Listening Tour Themes."

13. The love that DOE has for its students' parents, however, might not be shared by particular DOE administrators. Mr. Fonseca found this to be correct, at least as to Janice Bruce, School 291 Principal, who (in a phrase) never had the time of day for Mr. Fonseca.

14. That was reluctantly tolerable for a while, but as P. grew more into a young woman, the relationship of necessity between Fonseca and Bruce would bend and then break.

15. A problem started in Spring 2019. A young woman – "S.," a mainstream student, P.'s age, who attended School 291 with P. – began to show P. a little unwanted attention – usually verbally, although she threatened to fight P.

16. As far as Fonseca was concerned, this was never the archetypal bullying that a special-needs students might suffer. P. was called names that called to attention, in unflattering ways, her intellectual disability.

17. S. got some of her other friends to join in the verbal bullying of P.

18. S. at one point told her friends to tell P.'s friends that she was wanted to meet P. at a fast-food restaurant to fight.

19. Fonseca complained, including to Ms. Bruce, thought it was an emotional and bureaucratic struggle, and, as stated above, Bruce paid Fonseca no mind.

20. But then S.'s harassment of P. continued; she expressed distress to her parents and others. She cried. This caused her father distress, as well as the rest of the family.

21. Fonseca wanted the matter to stop. While Bruce took no steps to stop the harassment, by dint of his working at the DOE, at the end of the school year, people at School 291 hosted a meeting for the two girls. This meeting was called "mediation."

22. The idea of a "mediation" was objectively misguided. The evidence showed that S. was harassing P. P., the victim, was nevertheless instructed to sit in a room and meet on equal footing with her young harasser – no matter the harasser's motive.

23. P., a special-needs student, had no ability to "mediate" with S., the mainstream student. She can barely follow the logic of sentences, yet she was placed into a "mediation" wherein her harasser would be treated neutrally, and she would be on common footing with her mainstream harasser. It was nonsense plan to begin with and would fail.

24. Nevertheless, this "mediation" ended with no quarreling. More important, the meeting was the end of the school year. To the extent that this meeting quieted the parties down, it worked for the day; as summer approached, perhaps the people involved though it was a temporary *rapprochement.* In the fall, all would see if student S. and Plaintiff P. could get along in the next school year.

25. Fall classes began in August 2019. As might have been predicted, S., who suffered no discipline for her bullying P., and became more emboldened. Soon, she began to reveal the reasons she was drawn to P. It was not necessarily to make fun of her disability, but because S. had been acting out in the previous school year because she was physically attracted to P.

26. This became evident when S. commented favorably on P.'s figure, asking P. why she "didn't like girls instead of guys. Girls are better."

27. And despite the overblown attempt to mediate a problem of bad behavior, S.'s fixation on P. worsened.

28. On two occasions (approximately October 24 and 25, 2019), S. approached P. from the front and hugged her. While hugging her, S. grabbed P.'s buttocks and she squeezed in a sexual manner.

29. An administrative complaint was initiated by Fonseca, under the Rules of the Chancellor. An investigation was undertaken, in whole or in part by Dean Justin Hester of School 291. Dean Hester took written statements from students who were reportedly present when the hug and buttocks squeezes occurred. He made the final determination that "the Chancellor's rules [on sexual behaviors] had been broken."

30. This finding angered Bruce. Since Fonseca had filed the complaint that had been sustained, she set out to see that he would suffer.

31. Indeed, both Bruce and, at her behest, Ureña retaliated against Fonseca in multiple ways. Ureña was P.'s counselor. On information and belief, Because she was so active in undermining Fonseca, Bruce enlisted Ureña's assistance to make complaints against Fonseca. This had been and always was Bruce's modus operandi.

32. That Bruce and Ureña were working in concert is not necessary for this complaint. Nevertheless, first, Ureña attempted to get Fonseca in trouble after P. had – unbeknownst to Fonseca – lent her friend a cell phone. "J." is the name of the friend and she is a special needs student as well, though higher functioning.

33. Apparently, J.'s father was out of the country, and J could not reach him. P. gave J. her cellphone, in logic that made sense to her. The phone was owned by Mr. Fonseca, although he had given it to P.

34. Ureña noticed this exchange between the girls. She later took the phone from J. and asked her to unlock it, which J. did. Ureña then wrote out a statement for J. to sign that was false, mentioning that Mr. Fonseca (and not P.) had given J. the phone. This was a gross stretch of the imagination that allows for a malicious interpretation of the acts of Mr. Fonseca.

35. As it happens, P. and J. are close friends. J. had signed Ureña's statement, but at the behest of her father, she recanted it. Ureña had acted out of retaliation because Fonseca had filed the complaint with Dean Hester, and it resulted in a founded determination of harassment when she, as well as Bruce, had been importuned to resolve the problem at an earlier stage. She failed, probably because she believed nothing would happen with the investigation.

36. Ureña extracted a false narrative about the phone from J. to create the implication that Fonseca had intentionally given a cell phone to a special-needs child. Upon information and belief, Ureña then reported this allegation to a governmental entity and might have reported it to the police. She was transmitting this information in the attempt to imply the nefarious – something that no reasonable person would glean from the circumstances.

37. Ureña wanted to damage Fonseca's reputation – if not see him arrested. A false allegation like this can destroy a person's reputation.

38. Even if Ureña's actions did not lead to adverse consequences to Fonseca, it scared Fonseca thoroughly. An effort like this was beyond the typical politics one might expect at the DOE, but not beyond those of School 291.

39. At or about this time, P. was referred to private counseling at the suggestion of Ureña. Plaintiffs and the rest of their family availed themselves of the services at the Coalition

for Hispanic Family Services in Brooklyn. They had 4-5 visits and were discharged by the counselor.

40. Nevertheless on the very same day of the family's first meeting at Hispanic Family Services – and upon robust information and belief – Bruce called in a complaint to the Child Abuse Hotline in Albany.

41. While Bruce is known as a "mandated reporter" – i.e., a person who must, by law, report suspected cases of child abuse or neglect. But the law does not mandate a complaint that includes exaggerated facts or false information.

42. In New York City, Hotline complaints are referred to ACS, or the Administration for Children's Services. ACS has the authority to take children out of their parents' homes, on some emergency bases – and "emergency" is in the mind of the beholder – which authority may be exercised without court approval. The removal could also be longer. ACS may take a family to court to enforce goals that ACS – in its discretion and subject to the approval for the judge – believes are appropriate. But, again, ACS is staffed by workers with little specialized training. What ACS deem appropriate might seem arbitrary, and judges are loathe to overrule ACS' recommendations.

43. There exists the threat, with ACS in the works, that children might be removed from a family – even a family is in full compliance with agency's enforced goals. New goals are established; extensions of supervision or foster case are routine.

44. Being subject to ACS jurisdiction is an intrusion into a person's liberty. It is, to put it mildly, an embarrassment: a parent subject to ACS supervision cannot but feel defensive and judged by a government agency entering family life simply because of an anonymous call. But again, that Bruce called – on the very first day of the family's private

counselling, no less – and the fact that she was principal at P.'s school would ensure that ACS' investigation would not be a whitewash.

45. Bruce reported that P. was depressed, if not suicidal.

46. School 291 did not ask Fonseca to provide evidence that P. had attended family therapy – something that Fonseca and his wife would have agreed to provide.

47. But to Bruce, a call to ACS would be more effective in furthering her goal, which had nothing to do with the young P.'s well-being, but to retaliate against Fonseca.

48. Fortunately, ACS either saw through the ploy or realized all of Fonseca's children were safe. Though the caseworker initially visited unannounced – thereupon declaring that a complaint from School 291 reported that P. had had thoughts of suicide. This statement was a lie. The caseworker saw the family and was seemingly convinced the allegation was untrue. There were some weeks of supervision, but after Fonseca brought all of his children to an ACS casework supervisor, the family was discharged without further guidance.

49. Finally, Madeleine Rodriguez - an Assistant Principal at School 291- tried to suggest that Fonseca was mismanaging money. He was involved in many of PTA and Community Relationships, which include staging community events at the School (or elsewhere).

50. As such, just before the school closed for the long weekend preceding Christmas, Fonseca hired a Mariachi band to serenade the students and parents. This was pre-approved by DOE.

51. The Dean's report of the violations of the Chancellor's Rules had barely been handed down.

52. Nevertheless, during the Mariachi performance, Rodriguez confronted Fonseca to ask him where he got the money – a total of $2000 – to hire the band. Fonseca said, "This is my private donation to the community." Rodriguez said, "I'm going to find out about this." It was Fonseca's money.

53. Upon information and belief, Rodriguez then made a 311 call to complain about her alleged concerns, then 311 referred the matter to the DOE. Fonseca learned of these complaints, which were not acted upon by the DOE.

54. Fonseca could no longer tolerate this retaliation. Perhaps wishfully, he was offered and accepted a mediation with Bruce and other DOE administrators. But for reasons unverified, the intervention was canceled. It was said to be rescheduled in two weeks, but never was.

55. Why, Fonseca wondered, would he trust the DOE when it had not lived up so many other promises? Moreover, certain DOE personnel made his life complicated when all he wanted to do was protect his special-needs daughter. A mediation was not going to change DOE culture.

56. Fonseca decided he had to move his family to Georgia – a place he had once lived – to remove the failures of the DOE toward P. and its retaliation toward him at a school that can meet P.'s needs.

57. In one of Fonseca's last conversations with anyone at DOE, he asked Deputy Chancellor Adrian Austin, "If that were your daughter, what would you do?" Austin responded, "I think you know what I would do" (or words to that effect). Fonseca and Austin had discussed the unpalatable option of removing his daughter from an otherwise functioning school; the whole point of their conversations was to avoid that.

58. But after getting an indicated sexual harassment complaint, Fonseca suffered retaliation and the School was doing nothing for P. if it continued to undermine his effectiveness. Fonseca decided that, despite his daughter's wishes – and his two youngest children were wailing when they had to say goodbye to their friends – he had no choice to get P. out of the school, even if she had a decent IEP there.

59. In addition to withdrawing P. from 291, he removed her from the entire DOE (as well as his other two children). Fonseca understood the politics at DOE so well, and would not trust them ever again to his detriment.

60. Their new life in Georgia is currently rocky. With help, they will stabilize, but no parent of a special-needs (or other vulnerable) student should have to flee the jurisdiction because the local school system is often dysfunctional, tribal and territorial, and retaliatory.

61. He and his daughter now sue for redress.

FIRST CAUSE OF ACTION
TITLE IX
RETALITATION brought by LUIS FONSECA

62. Plaintiffs repeat and reallege all previous paragraphs as if set forth herein.

63. Courts have uniformly interpreted Title IX, 20 U.S.C. § 1681, implies a private right of action against a program or activity, such as the New York City DOE, that accepts federal funding as subject to Title IX, which prohibits sex discrimination.

64. Retaliation is prohibited under Title IX per all courts to have reached the question, including the Second Circuit in 2011. *See Papelino v. Albany Coll. of Pharmacy of Union Univ.,* 633 F.3d 81 (2d Cir. 2011).

65. Ureña, Bruce and Rodriguez were acting the scope of their employment when they committed the four retaliatory actions after the sexual harassment was founded by the Dean: (1) bringing false charges to ACS; (2) accusing plaintiff of giving a cell phone to a student, J., to communicate with Fonseca; (3) questioning and then reporting Fonseca's hiring a Mariachi band at a Thanksgiving event.

66. Any one of these acts, let alone three combined, would deter a reasonable parent from making a complaint of discrimination.

67. Mr. Fonseca, knowing Ms. Bruce would never stop in her passive-aggressive and sometimes surreptitiously aggressive treatment of him. He took the advice of the Deputy Chancellor Austin and got P. out of the school – something she didn't want.

68. This caused emotional distress: Fonseca knew it was difficult to get a proper IEP, and he would have to trust the DOE to fashion a similar one for P., and she could have been transferred to a school far out of her neighborhood. He didn't trust the DOE, so he returned to Georgia, a place he had once called home. He hope to stabilize his entire family, but none of it had to occur, had the retaliation not occurred.

69. As a result of the foregoing, Fonseca has been damaged.

SECOND CAUSE OF ACTION
TITLE IX
SEXUAL HARASSMENT brought by P.

70. Plaintiffs repeat and reallege all previous paragraphs as if set forth herein.

71. P. was sexually harassed twice because of defendants' deliberate indifference to the anomalous attraction of S. to P starting in 2019.

72. While there was a "mediation" between the two young women, it was too late in the school year to have been effective. The idea of "mediating" a problem between a special needs student and a mainstream student was doomed to fail. The mainstream student was

11

harassing the special-needs student. In such a case, the mainstream student needs counselling or discipline; to bring P. into the dissonance between the two validated P.'s behavior.

73. In the coming months, the behavior escalated, resulting in a violation of the Chancellor's Rules when S. on two occasions squeezed P.'s buttocks in a sexual manner.

74. As a result of the foregoing, P. has been damaged.

THIRD CAUSE OF ACTION
VIOLATION OF THE CITY HUMAN RIGHTS LAW
RETALIATION

75. Plaintiffs repeat and reallege all previous paragraphs as if set forth herein.

76. As a result of the foregoing, plaintiff Luis Fonseca has been damaged.

FOURTH CAUSE OF ACTION
VIOLATION OF THE CITY HUMAN RIGHTS LAW
SEXUAL HARASSMENT

77. Plaintiffs repeat and reallege all previous paragraphs as if set forth herein.

78. As a result of the foregoing, plaintiff P. has been damaged.

FIFTH CAUSE OF ACTION
NEGLIGENCE
Brought by P.

79. Plaintiffs repeat and reallege all previous paragraphs as if set forth herein.

80. Plaintiffs filed a timely notice of claim noting the events of October 24 and 25.

81. As a result of the defendants' negligence, when it knew of a problem between P. and S., by failing to take measures to stop S.'s harassment of P., P. was (a) put in actual fear of immediate battery; and (b) thereafter touched by S. twice in a sexual manner.

82. As a result of the foregoing, plaintiff P. has been damaged.

WHEREFORE, Plaintiff demands the following relief:

1. Compensatory Damages in an amount exceeding $75,000;

2. Punitive Damages;

3. Attorneys' fees under 42 U.S.C. § 1988 or the New York City HRL;

4. Such other relief as the Court may deem appropriate.

Dated: New York, New York
February 5, 2020


*Greg S. Antollino*
GREGORY ANTOLLINO, ESQ.
275 SEVENTH AVENUE, SEVENTH FLOOR
NEW YORK, NEW YORK 10001
(212) 334-7397
gregory10011@icloud.com